# UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF FLORIDA

|  |  |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | ) ) ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| R.J. FITZGERALD & CO., INC., RAYMOND FITZGERALD, LEIZA FITZGERALD, GREG BURNETT, AL CORINGRATO, and CHUCK KOWALSKI, | ) ) ) ) ) |
|  | ) |
| Defendants. | ) |

Civil Docket No. 99-1558 CIV-T-23 F

## COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT

### I.  SUMMARY

1.    From January 1996 through July 1998 (the "relevant period"), defendants Raymond Fitzgerald, Jr. ("R. Fitzgerald"), Leiza Fitzgerald ("L. Fitzgerald"), Al Coringrato ("Coringrato"), Chuck Kowalski ("Kowalski"), and Greg Burnett ("Burnett") controlled and/or operated the defendant firm, R. J. Fitzgerald & Co. ("RJFCO"), a registered introducing broker ("IB").  RJFCO's business involved the solicitation and trading of client accounts in commodity futures and options transactions.

2.    The individual defendants ran RJFCO in a systematically fraudulent manner. During the relevant period, approximately 1200 persons became RJFCO clients, usually through solicitations to deposit minimum investments of $5,000.  As a result, during the

relevant period, RJFCO generated several million dollars in customer deposits, and approximately $2,800,000 in commission charges.

3.     RJFCO, through the actions of its principals and associated persons ("APs"), engaged in fraudulent sales solicitations. R. Fitzgerald starred in television commercials that sought through false, deceptive, or misleading claims to attract unsophisticated individuals to become clients of the firm. He also developed other advertisements that contained deceitful and misleading statements that the firm would educate clients about the benefits and risks of trading in commodity markets, when in fact it did not.

4.     Together with L. Fitzgerald and Coringrato, R. Fitzgerald also devised telephone solicitations that substantially underplayed, and sometimes failed to mention, the inherent risks involved in trading commodity options. The Fitzgeralds and Coringrato instructed RJFCO APs to use fraudulent representations and techniques to attract clients and open new accounts. Prospective clients were urged to send their money to RJFCO as quickly as possible to take advantage of purported "unique" market situations that RJFCO fabricated for the purpose of pressuring clients to send in their funds. After new clients opened their accounts, RJFCO APs failed on a number of occasions to provide them with the risk disclosures required by Commission Regulations.

5.     RJFCO, through the actions of its principals and APs, also defrauded clients in the handling and/or trading of accounts. After clients opened accounts, R. Fitzgerald, Kowalski and Burnett instructed the firm's APs to trade clients' accounts to generate commissions for the firm without regard for the clients' interests. RJFCO APs churned client accounts. Moreover, R. Fitzgerald, Kowalski and Burnett demanded that the APs try to

convince clients to trade as much account equity as possible, as quickly as possible, and the APs did. If the APs did not quickly and substantially diminish the client's account by commissions and fees, they were instructed to "roll the money over twice a month," i.e., to execute two sets of options trades each month, regardless of the actual market conditions or the client's trading objectives. APs made false and misleading statements to clients to achieve these goals, and marketed poorly researched trading strategies devised by Kowalski for this purpose.

6.      Defendants have engaged, are engaging, or are about to engage in acts and practices that violate Sections 4b(a)(i), (iii) and 4c(b) of the Commodity Exchange Act ("CEA"), as amended, 7 U.S.C. §§ 6b(a)(i), (iii), 6c(b) (1994), and Commission Regulations 32.9(a), (c), 33.7, 33.10 (a), (c), and 166.3, 17 C.F.R. §§ 32.9(a), (c), 33.7, 33.10 (a), (c), and 166.3 (1998).

7.      Accordingly, pursuant to Section 6c of the CEA, 7 U.S.C. §13a-1 (1994), plaintiff Commodity Futures Trading Commission ("Commission") brings this action to enjoin such acts and practices, and to compel compliance with the provisions of the CEA. In addition, the Commission seeks civil penalties and an accounting, disgorgement, restitution, and such other equitable relief as the Court may deem necessary or appropriate.

8.      Given the defendants' pattern of fraudulent activity, the defendants are likely, unless restrained and enjoined by this Court, to continue to engage in the acts and practices alleged in this Complaint, as more fully described below.

## II.  JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to Section 6c of the CEA,

7 U.S.C. § 13a-1, which provides that whenever it shall appear to the Commission that any

person has engaged or is about to engage in any act or practice constituting a violation of any

provision of the CEA or any rule, regulation, or order promulgated thereunder, the

Commission may bring an action against such person to enjoin such practice or to enforce

compliance with the CEA and the Commission's regulations.

10.    Venue properly lies with this Court pursuant to Section 6c(e) of the CEA, 7

U.S.C. § 13a-1(e), because the defendants are found in, inhabit, or transact business in this

District and the acts and practices in violation of the CEA and Commission Regulations have

occurred, are occurring, or are about to occur within this District, among other places.

## III.  THE PARTIES

**Plaintiff**

11.    Plaintiff Commission is an independent federal regulatory agency which is

charged with the administration and enforcement of the CEA, 7 U.S.C. §§ 1 et seq. (1994),

and the regulations promulgated thereunder, 17 C.F.R. §§ 1.1 et seq. (1998).

**Defendants**

12.    **R.J. Fitzgerald & Co., Inc. ("RJFCO")** is a Florida corporation that has

been registered with the Commission as a guaranteed introducing broker ("IB") since

November 1992.   Its obligations are guaranteed by Iowa Grain Company ("Iowa Grain"), a

registered futures commission merchant.   From approximately November 1996 until

December 1998, RJFCO conducted its business from 7650 Courtney Campbell Causeway,

Suite 100, Tampa, Florida 33607. RJFCO was created by Defendant R. Fitzgerald, Jr. and continues to be a registered entity with the Commission and an active corporation in the State of Florida.

13.     **Raymond Fitzgerald, Jr.** ("R. Fitzgerald") resides at 867 Bay Esplanade, Clearwater Beach, Florida 34630. He formed RJFCO, and is its President and sole shareholder. Since November 1992, R. Fitzgerald has been registered as an associated person ("AP") and designated as a principal of RJFCO.

14.     **Leiza Fitzgerald** ("L. Fitzgerald") is the wife of R. Fitzgerald and resides with him at 867 Bay Esplanade, Clearwater Beach, Florida, 34630. She has been registered as an AP of RJFCO since May 1996, and that registration remains in effect. At RJFCO, she supervised APs. Starting on January 8, 1999, L. Fitzgerald has also been registered as an AP and designated as a principal of Financial Trading Alliance ("FTA"), an IB and commodity trading adviser ("CTA") operating under temporary registrations.

15.     **Chuck Kowalski** ("Kowalski") resides at 5520 Gunn Highway, # 1914, Tampa, Florida 33624. Kowalski was the trading analyst for RJFCO between May 1997 and December 1998. Kowalski was originally registered as an AP of RJFCO between December 1994 and January 1996, but voluntarily terminated his employment with RJFCO on January 5, 1996. On or about May 12, 1997, Kowalski rejoined RJFCO as an AP and is still registered with the firm. On January 8, 1999, Kowalski obtained temporary registration status as an AP and principal of FTA, L. Fitzgerald's firm.

16. **Greg Burnett** ("Burnett") resides at 8291 Sycamore Drive, New Port Richey, Florida. Burnett was registered an AP of RJFCO between June 1997 and July 1998, where he worked as a trading supervisor.

17. **Al Coringrato** ("Coringrato") resides at 9075 Quail Creek Drive, Tampa, Florida. Coringrato was registered as an AP of RJFCO between January 1997 until August 1998.

## IV.   FACTS

### A.   Statutory and Regulatory Background

18. A futures commission merchant ("FCM") is defined in Section 1a(12) of the CEA, 7 U.S.C. § 1a(12) (1994), and is further defined in Commission Regulation 1.3(p), 17 C.F.R. § 1.3(p) (1998), as an individual, association, partnership, corporation, or trust that is engaged in the business of soliciting or accepting orders for the purchase or sale of any commodity for future delivery, or option on commodity futures contracts, on or subject to the rules of any contract market and that, in or in connection with such solicitation or acceptance of orders, accepts money, securities or property to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

19. An introducing broker ("IB") is defined in Section 1a(14) of the CEA, and Commission Regulation 1.3(mm), 7 U.S.C. 1a(14) (1994), 17 C.F.R. § 1.3(mm) (1998), as any person who, for compensation or profit, whether directly or indirectly, is engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market who does not accept any money, securities

or property to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

20.     An associated person ("AP") as defined in Commission regulation 1.3(aa), 17 C.F.R. § 1.3(aa) (1998), is a natural person associated with any FCM, IB, as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves: (i) the solicitation or acceptance of clients' orders, discretionary accounts, or participation in a commodity pool; or (ii) the supervision of any person or persons so engaged.

### B.     RJFCO's Operations

21.     During the relevant period, RJFCO solicited members of the public to open accounts to purchase and sell exchange-traded futures and options contracts.

22.     During a portion of the relevant period, RJFCO represented to prospective clients ("Prospects") that it was a full-service brokerage firm and provided valuable trading advice to its clients, and that this service distinguished RJFCO from other IBs. RJFCO induced a majority of its clients to become clients based upon these representations. During a portion of the relevant period, RJFCO and its APs provided trading advice to clients and sought to control the trading in client accounts.

23.     R. Fitzgerald controlled RJFCO's operations and, together with his wife, L. Fitzgerald, oversaw the firm's solicitation of clients. For part of the relevant period, Coringrato joined them in supervising the firm's APs who act as sales representatives and in soliciting clients. In addition, R. Fitzgerald worked with Burnett and Kowalski to develop

and implement trading recommendations, and each of them had a role in controlling and overseeing the APs' trading of client accounts.

24.     RJFCO primarily sought Prospects through radio, television, and newspaper advertisements that R. Fitzgerald created, reviewed and/or approved prior to their broadcast or publication. Prospects called RJFCO in response to the advertisements.

25.     RJFCO's advertisements repeatedly represented that the firms' employees, and R. Fitzgerald himself, would educate clients and Prospects because well-educated clients made better and more profitable clients.

26.     During the relevant period, RJFCO primarily hired APs who had little or no experience trading in commodity markets. RJFCO provided little or no training to its APs about the nature of, or trading in, commodity markets, or relating to the rules and regulations governing APs or IBs.

27.     RJFCO required all employees to undergo sales training courses. R. Fitzgerald instructed L. Fitzgerald on what to teach in her sales training courses, and L. Fitzgerald then taught the sales training course intermittently between April 1996 and the end of the relevant period.

28.     L. Fitzgerald instructed Coringrato on what to teach in his sales training course, and Coringrato then taught the sales training course from approximately January 1997 until April 1997.

29.     Beginning no later than January 1996, the firm's APs were divided into two groups: "Brokers," APs whose job was to solicit clients; and "Traders," APs responsible for providing trading advice to, and placing orders for, clients.

30.     During the relevant period, RJFCO usually compensated Brokers and Traders on a commission basis, generally paying them no more than $10 per contract traded by a client, although the commission structure varied occasionally.

31.     During the relevant period, RJFCO supervisors consisted of R. Fitzgerald, L. Fitzgerald, Coringrato, and Burnett. During time periods when someone other than R. Fitzgerald acted as a direct supervisor, R. Fitzgerald supervised both the supervisors and the RJFCO Brokers and Traders. RJFCO supervisors were paid on both a salary and commission basis.

32.     During the relevant period, R. Fitzgerald was responsible for the day-to-day management of the firm and exercised ultimate authority and control over RJFCO's APs, including the authority to discipline or terminate them. R. Fitzgerald reviewed and approved clients' account opening documents, provided weekly instructions to Brokers on how to increase sales and client deposits, and occasionally monitored Brokers' sales solicitations. R. Fitzgerald reviewed Traders' client equity runs on a daily basis, monitored Traders' recommendations to clients, and assisted in the development of RJFCO's trading recommendations. R. Fitzgerald provided almost daily instruction to Traders about how to convince clients to execute trades the firm recommended. R. Fitzgerald created or approved all advertisements and promotional materials used by RJFCO, managed the financial aspects of the firm, and was responsible for making the firm's decisions in all legal proceedings. R. Fitzgerald exercised supervisory control over L. Fitzgerald, Coringrato, Burnett, and Kowalski.

33. During the relevant period, R. Fitzgerald did not implement or maintain an adequate system of internal supervision or control that monitored, assessed, or corrected RJFCO APs' fraudulent solicitations of Prospects, fraudulent trade recommendations to clients, or fraudulent trading of client accounts.

34. During the relevant period, L. Fitzgerald primarily recruited, supervised, and trained sales Brokers, and, on occasion, solicited clients directly. RJFCO compensated L. Fitzgerald solely on a salary basis. L. Fitzgerald also assisted in developing advertisements and supervising Traders, and served as the firm's personnel manager. She also monitored the firm's Brokers for effective solicitation techniques, and, during some of the Brokers' weekly meetings, provided specific directions and instructions to Brokers regarding their sales solicitations.

35. During the relevant period, L. Fitzgerald and Coringrato did not implement or maintain an adequate system of internal supervision or control that monitored, assessed, or corrected RJFCO APs' fraudulent solicitations made to Prospects. During the relevant period, Burnett did not implement or maintain an adequate system of internal supervision or control that monitored, assessed, or corrected RJFCO Traders' fraudulent solicitations and trading of clients' accounts.

36. During the relevant period, Kowalski occasionally served as the Traders' supervisor during periods of time when R. Fitzgerald or Burnett was absent. Kowalski generally made a daily review of Traders' equity runs for their assigned clients. Kowalski, with the assistance of R. Fitzgerald, and occasionally Burnett, developed and implemented the firm's "position trades." "Position trades" were trading recommendations given to clients

regardless of the client's trading objectives, risk tolerance, or account equity. Kowalski developed and produced "bullet sheets" that contained the firm's purported trade recommendations and distributed them to Brokers, knowing that they did not describe accurately the firm's trade recommendations including the firm's "position trades."

## C.    **RJFCO Sales Practices**

(1)    <u>RJFCO and its APs Fraudulently Solicited Customers Through Material Misrepresentations and Omissions Made in Television Advertisements, Promotional Materials, and Oral Statements</u>

*Commercials and Promotional Materials*

37.    During the relevant period, RJFCO aired two different misleading television commercials on CNBC that promoted and falsely represented RJFCO's services in conducting commodity options and/or futures transactions for customers. The commercials were the principal means by which RJFCO attracted clients. In addition, RJFCO advertised and falsely represented its services in written promotional materials.

38.    Among the false and misleading claims that appeared in the commercials or promotional materials, or both, were: (i) statements that R. Fitzgerald and his firm would help educate Prospects and clients about commodities trading, which were materially false and misleading because R. Fitzgerald, L. Fitzgerald, Coringrato and Burnett each prohibited or discouraged Brokers and/or Traders from teaching or educating most Prospects and clients about the commodity markets; (ii) statements that RJFCO adheres to the rules of the industry and would "do what is right," which were materially deceptive and misleading because, among other reasons, RJFCO recommended trades that generated commissions for RJFCO without regard for the clients' interests, made statements that minimized the risks inherent in

trading commodity futures and options, and failed to provide required risk disclosure statements to many clients, in violation of the CEA and Commission Regulations; (iii) representations that RJFCO would provide clients with individual, personalized service, which were materially false and misleading because R. Fitzgerald, Kowalski, and Burnett instructed and encouraged or allowed RJFCO Traders to make identical trading recommendations to the firm's clients without regard to the individual client's trading objectives or individual risk tolerances; (iv) representations about the high profit potential of trading commodities that were materially misleading in light of the failure to disclose that a substantial majority of the RJFCO's clients closed their accounts at a loss, often at a substantial loss; (iv) representations about the profit potential arising from El Niño related weather events that were false and materially misleading because they claimed that currently-known market conditions would increase the likelihood of profiting in the corn commodity markets, when in fact the price of a futures contract and the premium price of an option on a futures contract already reflect all available market information; (v) the omission to disclose that some options being advertised were deep out-of-the-money options that would have to achieve a dramatic price move to achieve the high profits being promoted; and (vi) misrepresentations about existing U.S. commodity reserves that made profit projections based on those misrepresentations themselves materially misleading.

39.     R. Fitzgerald wrote and appeared in the first commercial, approved the content of the second commercial, and either wrote or approved the content of the promotional literature. He knew, or was reckless in not knowing, that the statements made in

the commercials and promotional literature were materially false, deceptive, and misleading, or omitted material facts that would make the statements made not misleading.

*Oral Misrepresentations*

40.     From time to time during the relevant period, and in connection with the offer to enter into commodity option transactions or in connection with any order to make a futures transaction, L. Fitzgerald and Coringrato provided sales training to new Brokers. During the course of training seminars, L. Fitzgerald or Coringrato, or both, instructed new Brokers to make various material misrepresentations to Prospects for the purpose of acquiring them as RJFCO clients, including, but not limited to, representations to the effect that (i) RJFCO and its APs had been the subject of only one customer complaint, when in fact numerous complaints – dozens by the end of 1998 – had been lodged; (ii) RJFCO relied on dozens or hundreds of sources of information to develop the trading recommendations made to the firm's clients, when in fact it typically relied on no more than three or four, and often fewer; (iii) RJFCO Traders had many years' experience trading in the commodity markets, when in fact none of the firm's Traders had more than one year of experience trading in the commodity markets prior to working with RJFCO; and (iv) RJFCO employed an agricultural economist to analyze the markets and provide trade recommendations and strategies to the firm's clients, when in fact it did not do so.

41.     In addition, either R. Fitzgerald, L. Fitzgerald, or Coringrato, or all three, instructed Brokers to make statements similar to those made in the advertising and written promotional representations, to the effect that RJFCO would educate and teach the client about the commodity markets, and that RJFCO provided clients with their own Traders who

would advise the client on the risks associated with the firm-recommended trades, recommend trades that met the individual client's trading objectives, and provide individualized and personal advice to the client. Such statements were materially false and misleading for the reasons set forth in Paragraph 38.

42.     During the relevant period, R. Fitzgerald, L. Fitzgerald, and Coringrato knew or recklessly disregarded the fact that the representations they were each responsible for making, as described in paragraphs 40 - 42 above, were false, deceptive, and misleading.

43.     Also during the course of sales training, L. Fitzgerald or Coringrato, or both, instructed new Brokers to make other statements to Prospects that, in light of transactions RJFCO ultimately effected for clients, were false and misleading, including: (i) statements about the limited-risk nature of trading options rather than futures, when in fact RJFCO often recommended trades that mimicked futures or that contained a short option (i.e., high-risk) component; and (ii) representations to the effect that the most the client would risk losing by trading options on futures contracts is the money deposited to pay for the option, when in fact RJFCO placed clients in options strategies that required deposits of additional margin and that posed significant risk of loss in the spread between the purchase and sale price of the underlying futures contract.

44.     During the relevant period, L. Fitzgerald and Coringrato knew or recklessly disregarded the fact that the representations they were each responsible for making, as described in paragraph 43 above, were false, deceptive, and misleading.

45.     During the relevant period, in connection with the offer to enter into commodity option transactions or in connection with any order to make a futures transaction,

R. Fitzgerald, L. Fitzgerald, and Coringrato instructed, encouraged, or allowed RJFCO Brokers, when speaking to Prospects, to exaggerate the likelihood of profits and to misstate risks through misrepresentations and omissions about the nature of futures and options transactions: (i) similar to those made in RJFCO's advertisements and promotional materials; (ii) regarding the likelihood of large profits from options trading; (iii) claiming the existence of RJFCO clients who had made profits trading options; (iv) claiming the inability to lose money trading options because of unique options characteristics or the placement of stop-loss orders; and (v) characterizing the Commission-required risk disclosure statements as mere formalities on which the clients should not place much weight. Each of these statements was false and misleading in light of the substantial number of customer losses that actually occurred among RJFCO's clients, the actual risky options strategies often employed by RJFCO, the failure to explain that stop-loss orders do not automatically execute off-setting trades to prevent loss, and the fact that risk disclosure statements contain important and material descriptions of risk.

46.　During the relevant period, R. Fitzgerald, L. Fitzgerald, and Coringrato knew or recklessly disregarded the fact that the representations in paragraph 45 were materially false, deceptive or misleading.

47.　During the relevant period, L. Fitzgerald and Coringrato personally made additional materially false or deceptive statements to Prospects while soliciting the Prospects to become RJFCO clients.

(2)    <u>RJFCO Did Not Provide Adequate Risk Disclosure Statements to Prospects</u>

48.    Pursuant to Commission Regulations, RJFCO is required to provide its clients with risk disclosure statements before it opens or causes the opening of a commodity option account.  17 C.F.R.§ 33.7(a)(1) (1998).

49.    During the relevant period, Iowa Grain, RJFCO's guaranteeing FCM, provided RJFCO with two booklets (i.e., Booklet No. 1 and Booklet No. 2) that contained account opening documents and risk disclosure statements required by the Commission to be given or sent to customers.  Booklet No. 1 contained at least one required risk disclosure. Booklet No. 2 included the basic risk disclosure statements relating to options trading required by the Commission to be provided to all individuals prior to trading futures or options.  Because Booklet No. 2 contained risk disclosures relating to options trading required by the Commission, it should have been sent to new clients.

50.    At various times during the relevant period, RJFCO's APs sent new clients, by facsimile transmission, only certain pages of Booklet No. 1 that excluded the required risk disclosure, and sometimes did not send Booklet No. 2 at all to new clients before RJFCO opened or caused to the opening of new accounts.

51.    During the relevant period, R. Fitzgerald was aware or should have been aware of the fact that Booklet No. 2 and certain portions of Booklet No. 1 had not been sent to new clients prior to their trading of futures and options.

**D.    <u>RJFCO Trading Practices</u>**

52.    After a Prospect opened an account with Iowa Grain through RJFCO, as the introducing broker, he or she became a client of RJFCO.  When an individual became a

client, either R. Fitzgerald, Burnett, Kowalski, or L. Fitzgerald assigned the client to one of the firm's Traders.

> (1)  R. Fitzgerald, Burnett, Kowalski, and RJFCO APs Cheated, Defrauded, or Deceived, or Attempted to Cheat, Defraud, or Deceive RJFCO Clients

53. During the relevant period, a substantial majority of the firm's clients relied upon and followed the trading advice made to them by RJFCO Traders based in part on RJFCO APs' representations that clients could trust and rely upon such advice. R. Fitzgerald, Burnett, and Kowalski knew or recklessly disregarded the fact that a substantial majority of the firm's clients relied upon the Traders' advice and also sought to control the trading in their accounts through the RJFCO Traders.

54. During the relevant period, in connection with the offer to enter into commodity options transactions, or in connection with any order to make futures transactions, R. Fitzgerald, Burnett, and Kowalski committed individual acts of fraud, and also operated RJFCO in a systematically fraudulent manner designed to generate commissions without regard for, and by acting against, RJFCO clients' interests. For example, among other acts, practices and representations, R. Fitzgerald, Burnett, and, at times, Kowalski:

> (a)  instructed Traders to contact new clients as soon as their funds had been deposited and persuade them to trade as much of their equity as possible, as soon as possible, regardless of whether the trade was in the clients' best interests;
>
> (b)  instructed Traders to contact clients and claim, falsely, that urgent events had recently occurred or were about to occur in the market which, if the client acted quickly, would provide the client with the opportunity to make profits; and
>
> (c)  developed trading strategies based upon whether they would "sound good" or be easy to sell to clients, rather than upon any credible research or analysis.

R. Fitzgerald, Burnett, and Kowalski then instructed the Traders to recommend these trades to the firm's clients without regard for the profit potential of such a trade;

(d)    instructed Traders not to explain to clients the concepts involved and intricacies of the commodity futures and options markets. R. Fitzgerald, Burnett, and Kowalski encouraged the Traders to keep the clients unknowledgeable about commodity futures and options transactions.

55.    In addition, R. Fitzgerald established the policy of creating "position trades," which were developed and recommended uniformly to the firm's clientele, regardless of the individual clients' risk tolerances, account equity, or trading objectives. R. Fitzgerald, Kowalski, and Burnett developed the firm's "position trades" knowing that the firm's clients had been told by RJFCO APs or informed by RJFCO advertisements and promotional materials that each client received individualized trading advice and that the firm only recommended trades that served the best interests of the client.

56.    R. Fitzgerald, Burnett, and Kowalski allowed, encouraged, or permitted the Traders to:

(a)    fail to inform the clients that the firm's trade recommendations were developed for the purpose of generating commissions rather than to benefit the clients, despite RJFCO APs' claims that the recommended trades were made to benefit the clients' interests. If clients had been informed of this fact, reasonable clients would not have followed the trading advice given to them by RJFCO Traders; and

(b)    fail to inform the firm's clients that a vast majority of the firm's clients lost money, and many lost a substantial amount of money, while following RJFCO trading advice, despite RJFCO APs' claims about the firm's substantial experience and resources. If clients had been informed of this fact, reasonable clients would not have followed the trading advice given to them by RJFCO Traders.

(2)    RJFCO, R. Fitzgerald, Burnett and RJFCO APs Churned Clients' Accounts

57.    During the relevant period, R. Fitzgerald, Burnett, and RJFCO Traders exercised *de facto* control over at least the clients' accounts described below in paragraphs 58 - 66, as well as others.

58.    During the relevant period, in connection with the offer to enter into commodity options transactions, or in connection with any order to make a futures transaction, R. Fitzgerald and Burnett, and RJFCO's Traders at the direction of R. Fitzgerald and Burnett, advised clients described below, as well as other RJFCO clients, to execute trades for the primary purpose of generating commissions to profit RJFCO and its APs without regard for the clients' interests.

59.    For example, Burnett and Coringrato personally traded one client's account as follows: The client informed his RJFCO Broker, Coringrato, that he did not want to employ any high risk trading strategies. However, on the same day that the client made his initial and only deposit of $27,000, Coringrato contacted the client and placed him in his first trade, which required 96% of the account's equity being allocated in the first trade. The first trade generated $6,750 in commissions, or 25% of the entire account equity. After the initial trade, Burnett traded the client's account. Six days after the initial trade, Burnett contacted the client and, contrary to the client's instructions, placed him in a trading strategy with unlimited risk and leveraged the account to pay for RJFCO's commission charges. The client never approved of, or agreed to engage in, a trading strategy of unlimited risk. Burnett therefore departed from the trading strategy approved by the client. Burnett also instructed the client to close a trade involving only limited risk, and which appeared likely to be

profitable, to pay for the second, unlimited-risk trade. The second trade generated $6,000 in commissions for RJFCO. Soon after the second trade, Burnett contacted the client again and instructed him to close that trade. Then, four days later, Burnett instructed the client to reestablish a position nearly identical to the one he had just closed, resulting in an additional $600 in commission charges for RJFCO. As a result of Burnett's and Coringrato's trading of the client 's account, the overall commission-to-investment ratio for the client's account was 49%, and 96% of the account's equity was lost. Burnett also deceived the client by telling him that the second trade, which had unlimited risk, was merely an "extension" of the initial, limited risk strategy that would not result in any additional commission charges.

60.     In another example, Scott Eubanks, pursuant to R. Fitzgerald's and Burnett's directions and orders, traded the account of another client as follows: The client informed his RJFCO Broker, Steven Schriver, that he did not want to employ any trading strategy that could subject him to margin calls. Therefore, the client did not knowingly agree to any trading strategy involving the sale of options. Schriver told the client that the trades his assigned Trader would recommend to him would expose him to only limited risk. Eubanks was assigned to be the client's Trader. On the same day that the client made his initial and only deposit of $5,000, Eubanks contacted the client and placed him in a trade that resulted in 112% of the account equity being allocated in the first trade; in other words, the trade cost more than Schriver had deposited as his account equity. This trade generated $1,500 in commissions for RJFCO, or 30% of the entire account equity. Contrary to the client's instructions, this trade exposed the client to unlimited risk and margin calls because it involved the sale of options. Eubanks, therefore, departed from the trading strategy agreed to

by the client. Two weeks after this trade, Eubanks informed the client that he needed to get out of the trade due to the losses it had sustained. As a result of Eubank's trading activity, the overall commission-to-investment ratio for the client's account was 30%, and 91% of the account's equity was lost.

61.     Burnett personally traded another account as follows: The RJFCO Broker who solicited a client convinced the client that because of the El Niño weather pattern, the price of corn was going to increase substantially. The client made an initial, single deposit of $3,500. Burnett became the client's Trader. Burnett contacted the client one day after the account was opened and placed him in a trade. Burnett told the client that he believed the price of corn options would increase and that the trade he recommended would generate a profit if the price of corn increased. Contrary to what he told the client, Burnett placed the client in a long strangle trade strategy. A long strangle position is an option position consisting of the purchase of put and call options having the same expiration date but different strike prices. Along strangle position produces twice the commissions of a call option position, which may generate profits if the price of an option increases. As a result, the client 's first trade generated $600 in commission charges for RJFCO, or 17% of the account equity, and resulted in 86% of the account equity being allocated in this first trade. Seven days after this first trade, Burnett contacted the client and instructed him to close that position, and execute a long synthetic future, which is a trade that exposes the client to unlimited risk. The client had never agreed to a trading strategy of unlimited risk. The long synthetic future resulted in another $600 in commission charges for RJFCO. In response to the client's repeated requests for an explanation of the trades in which he had been placed,

Burnett falsely stated to the client that he could not explain the trades because he had no documents or statements that would allow him to discuss the trades. As a result of Burnett's trading activity, the overall commission-to-investment ratio for the client's account was 34%, and 93% of the account's equity was lost.

62. James Tooten, pursuant to directions and orders he received from R. Fitzgerald, traded the account of another client as follows: The client informed his RJFCO Broker, Eric Patterson, that he did not want to employ any trading strategy that could subject him to margin calls. Therefore, the client did not knowingly agree to any trading strategy involving the sale of options. Patterson told the client that the trades his assigned Trader would place him in would expose him only to limited risk. Based upon Patterson's representations, the client believed that by trading options he risked losing his deposit. Six days before the client's initial and only deposit of $3,500 was deposited with Iowa Grain, Tooten, the client's Trader, recommended trades to the client that involved the sale, as well as the purchase, of options. As a result, 214% of the account equity was allocated in this first trade. This trade generated $1,500 in commissions for RJFCO, or 34% of the entire account equity. All of the options the client purchased or sold expired worthless. As a result of Tooten's trading activity, the overall commission-to-investment ratio for the client's account was 34%, and 99.2% of the account's equity was lost.

63. Scott Eubanks, pursuant to directions and orders he received from R. Fitzgerald and Burnett, traded another client's account as follows: The client informed Eubanks that he wanted to limit his risk of loss and that he did not want his account equity to drop below $2,000. The client instructed Eubanks to make his trades as "stop loss orders" to

prevent the loss of no more than $3,000. The client believed that "stop loss orders" could accomplish this based upon the representations made to him by the RJFCO Broker who solicited his account. Stop-loss orders alone, however, cannot limit the amount of loss of trading. In his discussion with Eubanks, the client requested the use of stop-loss orders to prevent a loss in excess of $3,000. During this discussion, Eubanks did not correct the client's misunderstanding about stop-loss orders. On the same day that the client made his initial and only deposit of $5,000, Eubanks contacted the client and convinced him to execute a trade that resulted in the account being debited by 110% of the account equity. This trade generated $1,500 in commissions for RJFCO, or 30% of the entire account equity. This trade exposed the client to unlimited risk, and as a result, the risk of loss could not be limited to $3,000. Eubanks, therefore, departed from the trading strategy of limited risk that had been agreed to by the client. Two weeks after this trade, Eubanks informed the client that he had liquidated his trade because of the loses it sustained. As a result, the client retained only $735. Eubanks attempted to convince the client to sell options, a trade that also exposes a client to unlimited risk, to bring more funds into the account so that he could "get back into the game." The client declined and closed his account. As a result of Eubank's trading activity, the overall commission-to-investment ratio for the client's account was 30% and 85% of the account's equity was lost.

64.     Chris McKenna, pursuant to directions and orders he received from R. Fitzgerald and Burnett, traded another client's account as follows: Scott Campbell solicited the client to become a RJFCO client. The client informed Campbell that she had no experience in trading commodities and that she did not want to engage in risky financial

ventures.  Campbell informed the client that heating oil options had little risk and that the price of heating oil options always rises in the winter.  The client deposited $3,500 and, on the same day, Chris McKenna contacted the client and placed her in trades involving wheat and soybean options in addition to the heating oil options she had discussed with Campbell. The initial trade McKenna executed for the client included three inexpensive options with little time value (i.e., which were near their expiration dates).  The commission-to-premium ratio for these three options was 40%.  The initial trade also included a bear call spread strategy, which is a trade that is used by a trader trying to generate a profit for a client when the trader believes the price of an option is going to *decrease*, not increase as the client had been informed.  McKenna, therefore, departed from the trading strategy agreed to by the client.  Moreover, because it is a spread strategy, twice the amount of commissions are generated as compared to the purchase or sale of an option.  As a result of the initial trade, McKenna generated $900 in commissions for RJFCO, a 25% commission-to-investment ratio, and 139% of the client's account equity was allocated in this first trade.  The initial trade left the client with $536.21 in her account.  The next day, McKenna instructed the client to purchase another inexpensive option with these remaining funds.  The wheat and soybean options acquired in the first trade expired worthless and the client's remaining positions were offset approximately three months later, leaving $569.06 in her account.  As a result of McKenna's trading activity, the overall commission-to-investment ratio for the client's account was 28% and 84% of the account's equity was lost.

65.     Burnett personally traded another client's account as follows.  The client initially deposited $5,000.  John Rodgers served initially as the client's Trader.  The client

informed Rodgers that he wanted to keep his risk at a minimum and follow a conservative trading strategy. Rodgers instructed the client to purchase five call options. Thereafter, an error was made and the client's account was credited an additional $5,000. Six days after the account was opened, Burnett called the client and informed him that he would be his Trader from that point on. Burnett told the client falsely that he had traded commodities for many years. Burnett placed the client in a new trade that exposed him to unlimited risk Burnett, therefore, departed from the trading strategy agreed to by the client. This second trade generated $2,100 in commission charges for RJFCO. The following day the client deposited an additional $3,000. The client, however, had not yet realized that his account had been inflated by the erroneous $5,000 credit. Two days after the second trade, Burnett contacted the client again and instructed him to get out of the initial trade recommended by Rodgers, which exposed the client to limited risk, and advised him to execute another trade that exposed him to unlimited risk. Burnett, therefore, again departed from the trading strategy agreed to by the client. The client repeatedly asked Burnett to explain the trades to him but Burnett refused. Eventually the $5,000 credit to the client's account was discovered and taken out. The client had to deposit an additional $3,170 to cover the margin requirements in his account. The client closed his account and retained $995.17 of the $11,170 he had deposited. As a result of Burnett's trading activity, the overall commission-to-investment ratio for the client's account was 39% and 91% of the account's equity was lost.

66.     During the relevant period, R. Fitzgerald, Burnett, and Kowalski developed the trading recommendations that the RJFCO Traders made to the firm's clients. R. Fitzgerald, Burnett, and Kowalski instructed the RJFCO Traders to advise clients to follow

these trade recommendations. R. Fitzgerald, Burnett, and Kowalski instructed, encouraged, allowed, or participated in the trading of clients' accounts to derive a profit for themselves while disregarding the interests of the clients.

(3)     Falsification of Documents

67.     During the relevant period, at or around the time a RJFCO client opened his or her account, RJFCO purportedly required its APs to provide various kinds of information to the new client. The APs then, purportedly, were required to complete a document reflecting that information which was purportedly provided to the new client. This practice purportedly existed between January 1998 to July 1998.

68.     On at least one occasion during the relevant period, Burnett instructed a RJFCO AP to falsify the document described in paragraph 67 for several clients. Specifically, Burnett instructed a RJFCO AP to complete these documents after the clients' accounts had been opened, and without ever conferring with the clients.

69.     During the relevant period, on at least two occasions, RJFCO APs told a RJFCO client to submit false information in the account opening documents, including false statements regarding the client's previous commodity trading experience, or else the client would not be allowed to open a trading account.

(4)     RJFCO Traders Misrepresented and Failed to Disclose Material Facts To Clients

70.     During the relevant period, in connection with the offer to enter into commodity option transactions or in connection with any order to make a futures transaction, R. Fitzgerald and Burnett instructed, encouraged, or allowed RJFCO Traders to make occasional references to risk that were nullified by high-pressure sales tactics and by material

misrepresentations and omissions. The material misrepresentations include, but are not limited to:

(a)    RJFCO's clients could reasonably expect to make profits by following the Traders' advice and by executing the recommended trades; and

(b)    RJFCO clients could reasonably expect to make profits because of the publicly known effects of El Niño.

The material omissions include, but are not limited to, the failure to disclose the facts that:

(a)    a substantial majority of RJFCO clients closed their accounts at a loss;

(b)    RJFCO Traders do not provide clients with personal and individualized trading advice, and that Traders do not take into consideration the client's risk tolerance and trading objectives.

## V. VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT ONE

### FRAUD BY MISREPRESENTATION OR OMISSION OF MATERIAL FACTS IN CONNECTION WITH THE SOLICITATION OF COMMODITY FUTURES TRANSACTIONS

**VIOLATIONS OF SECTION 4b(a)(i), (iii) OF THE CEA, AS AMENDED, 7 U.S.C. § 6b(a)(i), (iii)**

71.    The allegations contained in paragraphs 1 through 70 above are re-alleged and incorporated by reference.

72.    During the relevant period, in or in connection with any order to make any contract of sale of any commodity for future delivery, R. Fitzgerald deceived or attempted to deceive other persons by making false and misleading representations of material facts in soliciting clients and Prospects including, but not limited to, those set forth in paragraphs 37-39. R. Fitzgerald knew that representations in the first commercial, identified in paragraphs 37-39, among others, were false and misleading or had no reasonable basis in fact. Consequently, R. Fitzgerald violated Section 4b(a)(i), (iii) of the CEA.

73.     Because the foregoing acts of R. Fitzgerald occurred within the scope of his

employment or office with RJFCO, RJFCO is liable for these acts, pursuant to Section

2(a)(1)(A)(iii) of the CEA and Section 1.2 of the Commission's Regulations.

## COUNT TWO

### FRAUD BY MISREPRESENTATION OR OMISSION OF MATERIAL FACTS IN CONNECTION WITH THE SOLICITATION, MAINTENANCE, OR EXECUTION OF COMMODITY OPTIONS TRANSACTIONS

**VIOLATIONS OF SECTION 4c(b) OF THE CEA, AS AMENDED, 7 U.S.C. § 6c(b), AND SECTIONS 32.9(a), (c) AND 33.10(a), (c) OF COMMISSION REGULATIONS, 17 C.F.R. §§ 32.9(a), (c) AND 33.10(a), (c) (1998)**

74.     The allegations contained in paragraphs 1 through 70 above are re-alleged and

incorporated by reference.

75.     During the relevant period, in or in connection with an offer to enter into, the

entry into, the confirmation of the execution of, or the maintenance of, any commodity

option transactions, R. Fitzgerald, L. Fitzgerald, Coringrato, Burnett, and RJFCO APs

cheated, defrauded, deceived or attempted to cheat, defraud, or deceive other persons by

making false and misleading representations or omissions of material facts in soliciting

clients and Prospects, including but not limited to, those set forth in paragraphs 37-39, 40-47,

54, 56, 59, 61, 64, 65, and 70 in violation of Section 4c(b) of the CEA and Sections 32.9(a),

(c) and 33.10(a), (c) of Commission Regulations.

76.     R. Fitzgerald knew or recklessly disregarded the fact that representations and

omissions, identified in paragraphs 37-39, 40-47, 54, 56, and 70, among others, were false

and misleading or had no reasonable basis in fact.

77.     L. Fitzgerald knew or recklessly disregarded the fact that representations and omissions identified in paragraphs 40-47, among others, were false and misleading or had no reasonable basis in fact.

78.     Coringrato knew that representations and omissions identified in paragraphs 40-47, among others, were false and misleading or had no reasonable basis in fact.

79.     Burnett knew that representations and omissions identified in paragraphs 59, 61, 65, and 70, among others, were false and misleading or had no reasonable basis in fact.

80.     RJFCO APs knew that representations and omissions identified in paragraphs 37-39, 40-47, 54, 56, 59, 61, 64, 65, and 70, among others, were false and misleading or had no reasonable basis in fact.

81.     The foregoing acts of R. Fitzgerald, L. Fitzgerald, Coringrato, Burnett, and RJFCO APs occurred within the scope of each such person's employment or office with RJFCO. Consequently, RJFCO is liable for these acts, pursuant to Section 2(a)(1)(A)(iii) of the CEA and Section 1.2 of Commission Regulations.

82.     R. Fitzgerald, L. Fitzgerald, Coringrato, and Burnett willfully aided, abetted, counseled, commanded, induced, procured, caused, or acted in combination or concert with other persons in violating Section 4c(b) of the CEA and Sections 32.9(a), (c) and 33.10(a), (c) of Commission Regulations, with respect to the violations set forth in the following paragraphs, among others:

| (a) | R. Fitzgerald | paragraphs 40-47, 54, 56, and 70; |
| (b) | L. Fitzgerald | paragraphs 40-47; |
| © | Coringrato | paragraphs 40-47; and |
| (d) | Burnett | paragraphs 54, 56, and 70. |

Consequently, R. Fitzgerald, L. Fitzgerald, Coringrato, and Burnett are liable for these violations of Section 4c(b) and 32.9(a), (c) and 33.10(a), (c) pursuant to Section 13(a) of the CEA.

83.     R. Fitzgerald actually exercised control or possessed the authority or ability to control the RJFCO APs that committed the foregoing violations of Section 4c(b) of the CEA and Sections 32.9(a), (c) and 33.10(a), (c) of Commission Regulations, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting these violations, with respect to the violations set forth in paragraph 80. Consequently, R. Fitzgerald is liable for these violations pursuant to Section 13(b) of the CEA.

## COUNT THREE

## OPERATING AN IB TO CHEAT, DEFRAUD, DECEIVE, OR TO ATTEMPT TO CHEAT, DEFRAUD, OR DECEIVE CLIENTS

**VIOLATIONS OF SECTION 4c(b) OF THE CEA, AS AMENDED, 7 U.S.C. § 6c(b), AND SECTIONS 32.9(a), (c) AND 33.10(a), (c) OF COMMISSION REGULATIONS, 17 C.F.R. § 32.9(a), (c) AND 33.10(a), (c) (1998)**

84.     The allegations contained in paragraphs 1 through 70 above are re-alleged and incorporated by reference.

85.     During the relevant period, in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transactions, R. Fitzgerald, Burnett, Kowalski, and RJFCO APs cheated, defrauded, deceived, or attempted to cheat, defraud, or deceive, other persons by recommending trades to clients for the primary purpose of generating commissions, without regard for the clients' interests, and by misleading clients about the nature of the trading advice they received from

RJFCO APs, as set forth in paragraphs 52-56, 57-66, and 70, among others, in violation of Section 4c(b) of the CEA and Commission Regulations 32.9(a), (c) and 33.10 (a), (c).

86.     R. Fitzgerald, Burnett, and Kowalski willfully aided, abetted, counseled, commanded, induced, procured, caused, or acted in combination or concert with other persons to cheat, defraud, deceive, or in attempt to cheat, defraud, or deceive, other persons in violation of Section 4c(b) of the CEA and Sections 32.9(a), (c) and 33.10(a), (c) of Commission Regulations, with respect to the violations set forth in paragraphs 52-56, 57-66, and 70, among others. Consequently, R. Fitzgerald, Burnett, and Kowalski are liable for these violations pursuant to Section 13(a) of the CEA

87.     R. Fitzgerald actually exercised control or possessed the authority or ability to control the RJFCO APs that committed the foregoing violations of Section 4c(b) of the CEA and Sections 32.9(a), (c), and 33.10 (a), (c) of Commission Regulations, and did not act in good faith with respect to the violations set forth paragraphs 52-56, 57-66, and 70, among others. Consequently, R. Fitzgerald is liable for these violations pursuant to 13(b) of the CEA.

88.     The foregoing acts of the RJFCO APs occurred within the scope of each such person's employment or office with RJFCO, consequently RJFCO is liable for these acts, pursuant to Section 2(a)(1)(A)(iii) of the CEA and Section 1.2 of Commission Regulations.

## COUNT FOUR

## FRAUD BY CHURNING CLIENT ACCOUNTS

**VIOLATIONS OF SECTION 4c(b) OF THE CEA, AS AMENDED, 7 U.S.C. § 6c(b), AND
SECTIONS 32.9(a) AND 33.10(a) OF COMMISSION REGULATIONS, 17 C.F.R. § 32.9(a)
AND 33.10(a) (1998)**

89.     The allegations contained in paragraphs 1 through 70 above are re-alleged and
incorporated by reference.

90.     During the relevant period, in or in connection with an offer to enter into, the
entry into, the confirmation of the execution of, or the maintenance of, any commodity
option transactions, R. Fitzgerald, Burnett, and RJFCO APs cheated or attempted to cheat
other persons by churning clients accounts as set forth in paragraphs 57-66, among others.  R.
Fitzgerald, Burnett, and RJFCO APs knew that they made trading recommendations to
RJFCO clients to generate commissions for RJFCO and themselves at the expense of the
clients' interests, or acted in reckless disregard of the clients' interests when making such
trade recommendations, as set forth in paragraphs 57-66, among others.

91.     R. Fitzgerald willfully aided, abetted, counseled, commanded, induced,
procured, caused, or acted in combination or concert with other persons to churn client
accounts in violation of Section 4c(b) of the CEA and Sections 32.9(a) and 33.10(a) of
Commission Regulations, with respect to the violations set forth in paragraphs 57-66, among
others.  Consequently, R. Fitzgerald is liable for these violations pursuant to Section 13(a) of
the CEA.

92.     Burnett willfully aided, abetted, counseled, commanded, induced, procured,
caused, or acted in combination or concert with other persons to churn client accounts in
violation of Section 4c(b) of the CEA and Sections 32.9(a) and 33.10(a) of Commission

Regulations, with respect to the violations set forth in paragraphs 60, 63, 64 and 66, among others. Consequently, Burnett is liable for these violations pursuant to Section 13(a) of the CEA.

93.     The foregoing acts of the RJFCO APs occurred within the scope of each such person's employment or office with RJFCO. Consequently, RJFCO is liable for these acts pursuant to Section 2(a)(1)(A)(iii) of the CEA and Section 1.2 of Commission Regulations.

94.     R. Fitzgerald actually exercised control or possessed the authority or ability to control the RJFCO APs that committed the foregoing violations of Section 4c(b) of the CEA and Sections 32.9(a) and 33.10(a) of Commission Regulations, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting these violations, with respect to the violations set forth paragraphs 57-66, among others. Consequently, R. Fitzgerald is liable for these violations, pursuant to Section 13(b) of the CEA.

## COUNT FIVE

### FAILING TO PROVIDE ADEQUATE RISK DISCLOSURE STATEMENTS PRIOR TO THE OPENING OR CAUSING THE OPENING OF A COMMODITY OPTIONS ACCOUNT

**VIOLATIONS OF SECTION 4c(b) OF THE CEA, AS AMENDED, 7 U.S.C. § 6c(b), AND SECTIONS 33.7(a) AND (b) OF COMMISSION REGULATIONS, 17 C.F.R. § 33.7(a) AND (b) (1998)**

95.     The allegations contained in paragraphs 1 through 70 above are re-alleged and incorporated by reference.

96.     During the relevant period, in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transactions, RJFCO APs failed to provide clients with the risk disclosure statements required by Section 33.7(a) and (b) of the CEA, as set forth in paragraphs 48-51.

97.     The foregoing acts of the RJFCO APs occurred within the scope of each such person's employment or office with RJFCO, consequently RJFCO is liable for these acts.

98.     R. Fitzgerald actually exercised control or possessed the authority or ability to control the RJFCO APs that committed the foregoing violations of Section 4c(b) of the CEA and Sections 33.7(a) and (b) of Commission Regulations, and did not act in good faith with respect to the violations set forth paragraphs 48-51.  Consequently, R. Fitzgerald is liable for these violations pursuant to Section 13(b) of the CEA.

## COUNT SIX

### FAILING TO SUPERVISE DILIGENTLY

**VIOLATIONS OF SECTION 166.3 OF COMMISSION REGULATIONS,
17 C.F.R. §166.3 (1998)**

99.     The allegations contained in paragraphs 1 through 70 above are re-alleged and incorporated by reference.

100.    During the relevant period, R. Fitzgerald, L. Fitzgerald, Burnett, and Coringrato had supervisory duties relating to their business as persons registered or required to be registered with the Commission.

101.    R. Fitzgerald failed to exercise diligently his supervisory duties including, but not limited to, the following:

> (a)     Failing to supervise diligently the sales practices and the sales solicitations of RJFCO Brokers, including, but not limited to, the acts, practices, and conduct set forth in the foregoing violations identified in Count Two;
> (b)     Failing to supervise diligently the trading of clients' accounts including, but not limited to, the acts, practices, and conduct set forth in the foregoing violations identified in Counts Three and Four;

(c) Failing to supervise diligently the supervisory practices of RJFCO's supervisors, including but not limited to, the acts, practices, and conduct set forth in the foregoing violations identified in Counts Two, Three, and Four;

(d) Failing to establish procedures to ensure compliance with Sections 33.7(a) and (b) of the Commission's Regulations, as set forth in Count Five; and

(e) Failing to design, implement, monitor and follow a program of supervision and compliance designed to deter and detect violations of the CEA or the Commissions regulations including, but not limited to, the acts, practices, and conduct set forth in the foregoing violations in Counts Two, Three, Four, and Five.

102. L. Fitzgerald and Coringrato failed to exercise diligently their supervisory duties including, but not limited to, the following:

(a) Failing to supervise diligently the sales practices and the sales solicitations of RJFCO Brokers including, but not limited to, the acts, practices, and conduct set forth in the foregoing violations identified in Count Two; and

(b) Failing to design, implement, monitor and follow a program of supervision and compliance designed to deter and detect violations of the CEA or the Commissions regulations including, but not limited to, the acts, practices, and conduct set forth in the foregoing violations identified in Count Two.

103. Burnett failed to exercise diligently his supervisory duties including, but not limited to, the following:

(a) Failing to supervise diligently the sales practices and the sales solicitations of RJFCO Traders including, but not limited to, the acts, practices, and conduct set forth in the foregoing violations identified in Counts Three and Four; and

(b) Failing to design, implement, monitor and follow a program of supervision and compliance designed to deter and detect violations of the CEA or the Commissions Regulations including, but not limited to, the acts, practices, and conduct set forth in the foregoing violations identified in Counts Three and Four.

# VI.    **RELIEF REQUESTED**

WHEREFORE, plaintiff respectfully requests this Court, as authorized by Section 6c of the

CEA, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, to enter:

A.    An order of permanent injunction enjoining RJFCO and R. Fitzgerald, and all persons

insofar as they are acting in the capacity of agents, servants, employees, successors, assigns,

or attorneys of RJFCO and R. Fitzgerald, all persons insofar as they are acting in concert or

participation with RJFCO and R. Fitzgerald who receive actual notice of the Order by

personal service or otherwise, from, directly or indirectly:

> Cheating, defrauding, deceiving, other persons, attempting to cheat, defraud,
> deceive other persons,  making or causing to be made any false report or
> statement, or attempting to make or to be made any false report or statement,
> by any means whatsoever in or in connection with any order to make, or the
> making of, any contract of sale of any commodity for future delivery, made or
> to be made, for or on behalf of any other person if such contract for future
> delivery is or may be used for (a) hedging any transaction in interstate
> commerce in such commodity or the products or byproducts thereof, or (b)
> determining the price basis of any transaction in interstate commerce in such
> commodity, or (c) delivering any such commodity sold, shipped, or received
> in interstate commerce for the fulfillment thereof, in violation of Section 4b(a)
> of the CEA, 7 U.S.C. § 6b(a) (1994).

B.    An order of permanent injunction enjoining RJFCO, R. Fitzgerald, L. Fitzgerald,

Burnett, Coringrato, and Kowalski, all persons insofar as they are acting in the capacity of

agents, servants, employees, successors, assigns, or attorneys of RJFCO, R. Fitzgerald, L.

Fitzgerald, Burnett, Coringrato, and Kowalski, all persons insofar as they are acting in

concert or participation with RJFCO, R. Fitzgerald, L. Fitzgerald, Burnett, Coringrato, and

Kowalski, who receive actual notice of the Order by personal service or otherwise, from,

directly or indirectly:

Cheating, defrauding, deceiving, other persons, attempting to cheat, defraud, deceive other persons, making or causing to be made any false report or statement, or attempting to make or to be made any false report or statement, by any means whatsoever in or in connection with any offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction, in violation of Section 4c(b) of the CEA and Commission Regulations 32.9 and 33.10, 7 U.S.C. § 6c(b) (1994), 17 C.F.R. §§ 32.9 and 33.10 (1998);

C.      An order enjoining RJFCO, R. Fitzgerald, L. Fitzgerald, Burnett, Coringrato,

and Kowalski from, directly or indirectly:

1.      Acting in any capacity that requires registration or exemption from registration from the Commission, including:

(a)      acting as a commodity trading advisor, or an associated person of such, within the meaning of Section 1a(5) of the CEA, 7 U.S.C. § 1(a)(5) (1994);

(b)      acting as an introducing broker, or an associated person of such, within the meaning of Commission Regulation 1.3(mm), 17 C.F.R. § 1.3(mm) (1998).

2.      Soliciting or accepting clients for commodity futures or options transactions, or accepting any new funds from existing clients; and

3.      Engaging in any commodity-related activity including acting in the capacity of a principal, agent, servant, employee, or adviser of any entity or person requiring registration or exemption from registration from the Commission.

D.      An order requiring RJFCO, R. Fitzgerald, L. Fitzgerald, Coringrato, Burnett,

and Kowalski to disgorge all benefits received from acts or practices that constitute

violations of the CEA and the Commission's Regulations as described herein;

E.      An order requiring RJFCO, R. Fitzgerald, L. Fitzgerald, Coringrato, Burnett,

and Kowalski, to make restitution to every client whose funds were received or utilized by

them as a result of acts and practices which constituted violations of the CEA and the

Commission's Regulations, as described herein, including pre-judgment interest;

F.     An order requiring RJFCO, R. Fitzgerald, L. Fitzgerald, Coringrato, Burnett, and Kowalski to pay civil penalties under the CEA, in an amount of not more than the higher of $100,000 or triple his monetary gain for each violation of the CEA committed prior to November 27, 1996 or $110,000 or triple his monetary gain for each violation of the CEA and the Commission's Regulations committed after that date;

G.     An order requiring RJFCO, R. Fitzgerald, L. Fitzgerald, Coringrato, Burnett, and Kowalski to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (1994); and

H.     Such other equitable relief as the Court may deem necessary or appropriate under the circumstances.

Date:   July 3, 1999                           Respectfully submitted,

.

Joan M. Manley, Esq.   (202) 418-5356
Florida Bar Number 779210
Wendy Woods, Esq.     (202) 418-5402
Attorneys for the Plaintiff
Commodity Futures Trading Commission

Three Lafayette Centre,
1155 21st Street, N.W.
Washington, D.C. 20581
(202) 418-5538  (fax)